## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

GERALD L. TROOIEN,
                              Civil No. 06-3197 (JRT/FLN)

               Plaintiff,

v.
                           **MEMORANDUM OPINION
                             AND ORDER**

PETER MANSOUR and
BARRY ROITBLAT,

               Defendants.

---

George G. Eck, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 54402; John Schochet, **DORSEY & WHITNEY LLP**, 1420 Fifth Avenue, Suite 3400, Seattle, WA 98101-4010, for plaintiff.

Brian D. Buckley and Stellman Keehnel, **DLA PIPER US LLP**, 701 Fifth Avenue, Suite 7000, Seattle, Washington 98104; Alan L. Kildow and Sonya R. Braunschweig, **DLA PIPER US LLP**, 90 South Seventh Street, Suite 5100, Minneapolis, MN 55402, for defendant Mansour.

Wesley Edmunds, **GORDON EDMUNDS ELDER PLLC**, 1200 112th Avenue NE, Suite C110, Bellevue, WA 98004; Brian Melendez, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendant Roitblat.

Plaintiff Gerald Trooien brought this direct action against defendants Peter Mansour and Barry Roitblat, two former executive officers of Sproqit Technologies, Inc. ("Sproqit"). Trooien alleges violations of Minnesota securities laws, negligent and fraudulent misrepresentation, and multiple breaches of defendants' fiduciary duties. On February 7, 2007, this Court granted defendants' motions to dismiss Trooien's complaint

for failure to plead fraud with particularity and granted Trooien leave to amend his complaint.  On May 23, 2008, the Court granted in part and denied in part Mansour's partial motion to dismiss the Amended Complaint, and granted Roitblat's partial motion to dismiss the Amended Complaint.  The claims that remain are (1) claims for breach of fiduciary duty against both defendants and (2) claims for violations of state securities laws against Mansour based on narrow grounds articulated in the Court's May 23, 2008, Order.  Both defendants now bring motions for summary judgment on all of the claims that remain.  In addition, both defendants move to strike declarations filed by Trooien in opposition to their motions.  For the reasons given below, the Court grants both defendants' summary judgment motions, and denies both motions to strike as moot.

## BACKGROUND

Trooien is a private investor, and a shareholder and director of Sproqit Technologies, Inc., a Washington-based corporation that develops mobile communications software.  Until March 2006, Mansour was Sproqit's President and Chief Executive Officer and Roitblat was Sproqit's Chief Technology Officer.  Both defendants also served on Sproqit's Board of Directors.  (*See* Am. Compl., Docket No. 42, ¶¶ 3, 4.)  Trooien alleges that between 2003 and 2005 both defendants made material misrepresentations and failed to disclose material facts regarding Sproqit's financial health and business prospects.  Trooien alleges that these misrepresentations induced him to invest over $7 million in Sproqit.

The misrepresentations alleged by Trooien began in July 2004.  On July 9, 2004, Mansour sent Trooien an email describing plans for Sproqit's new Vice President of Sales.  The email adds the following about Sproqit's revenue prospects:

> We are targeting revenues of about $100K/month for the last 3 months of the year.  Starting next year they will take a huge jump.  While that is our target, I would like to stay conservative and set the number at about $50K/month.  I will have a much more detailed analysis by the end of next week.

(*See* Buckley Aff., Docket No. 113, Ex. E at 11.)

On August 3, 2004, Mansour sent draft revenue projections to Roitblat and several others and asked for feedback.  (Baehr Aff., Docket No. 124, Ex. A.)  Mansour noted that the numbers were "just a starting point."  (*Id*.)  Mansour projected monthly revenues of $56,100 for November 2004, $72,400 for December 2004, and revenue escalating from $95,388 in January 2005 to $531,500 in December 2005.  (*Id*.)  Roitblat responded that he was "still more pessimistic than this," and Martin Heimbigner, an outside accountant, edited the figures and commented that Mansour's projected ramp-up in the number of distributors was "pretty steep."  (*Id*., Ex. B.)  In light of these comments, Mansour reduced his projections to $44,100 for November 2004, $56,400 for December 2004, and revenue escalating from $72,888 in January 2005 to $447,500 in December 2005.  (*Id.*)  On August 5, 2004, Mansour emailed these revised projections to Trooien.  Mansour noted:

> Well, we'll got [sic] a first cut at some revenue projections.  I limited these to things that are at least 75% certainty right now.  Of course, things will change, but we also feel like we'll bee [sic] adding some bigger players to this soon.  I'm sending this now, with caveat that there will be changes

before the BOD meeting.  We will put together a complete rev/cost model
before that meeting.

(Mansour Aff., Docket No. 114, Ex. J.)

On December 16, 2004, Heimbigner sent Mansour another set of draft revenue projections.  (Baehr Aff., Docket No. 124, Ex. F.)  Heimbigner noted that he had limited the projections to a twelve-month time-frame, explaining "I don't think we want to imply that we have visibility into 2006 or 2007 revenues until some deals sign and start to perform."  (*Id*.)  Heimbigner added "we may want to ratchet back some assumptions so that the ramp is a little slower and we don't feed expectations that [Trooien] will fixate on."  (*Id*.)  Mansour responded that the projections were a "good start," and suggested several edits related to additional anticipated business deals.  (*Id*., Ex. G.)  After incorporating Mansour's edits, Heimbigner's projections anticipated $4.1 million in revenue for 2005.  (*Id*.)

Heimbigner added, however, "I am wondering if we should moderate the revenues to control expectations?  Going to $2 million in revenues for first full year of revenue may keep expectations in check and allow us under promise and over deliver [sic]."  (*Id*.)  Mansour responded "[w]e have a catch 22.  We've been telling [Trooien] about these deals.  Now if we show him a sheet without them he'll be totally pissed and start with the YOU said blah, blah blah."  (*Id*.)  Heimbigner responded "I agree.  I was thinking that we might start the ramp a little slower and perhaps make the minimum commits at say 80% of what we are trying to negotiate, so that there is room for positive surprises."  (*Id*.)  Heimbigner then prepared one set of projections that included "100%" of their expected

- 4 -

revenues from their expected business deals, and one set including "80%." (*Id*.) The projections given to Trooien on December 21, 2004, anticipated $3,363,887 in revenue for 2005. (*Id*., Ex. H.) Heimbigner included a note with the projections indicating that they were "preliminary," and that "there is a risk that some of these deals [included in the projections] may not occur." (*Id*.)

In mid-January 2005, Trooien contacted Mansour to inquire as to why Sproqit was not performing as expected. (Buckley Aff., Docket No. 113, Ex. E.) Trooien expressed dissatisfaction after new "official" projections showed Sproqit failing to break even in 2004, and losing nearly $1.8 million in 2005. (*Id*.) Mansour responded with a lengthy email stating in part:

> The last projection we sent was a draft. I think we were clear on that. Now, we continue to work to be profitable by July, but I want my official projections to be conservative. One thing to note is that this model also includes paying off all past liabilities, so it is not simply expenses versus revenue.

(*Id*. at 23.) Ultimately, Sproqit's revenues for 2005 were less than $100,000. (*See id*., Ex. C at 82.)

Mansour was later asked in his deposition why Sproqit performed more poorly than expected during this time period. Mansour indicated that they had "found a bug in Windows which severely hindered us from getting the project done in time. If we don't have a project, we cannot sell it." (*Id*., Ex. C at 86.) Mansour further explained that the bug "made us late to market and put huge pressures on us, which I have explained to Mr. Trooien and he understands. At least he indicated that he did." (*Id*., Ex. C at 87.)

Trooien alleges that "[a]t no time did Mr. Mansour ever tell [him] that a 'severe software bug' was impacting the company's software development schedule." (Trooien Dec. ¶ 9.)

Trooien argues that defendants further misled him with misrepresentations concerning several specific areas of Sproqit's business.

## A.    Archos

On May 2, 2005, Mansour sent an email to Trooien describing a deal with Archos, a company that sold devices capable of employing Sproqit's software.[1]  (Trooien Aff., Docket No. 125, Ex. C.)  Mansour stated that "Sproqit will receive a one-time royalty of $1.50 for every device with built-in wireless capability . . . that Archos sells . . . .  They believe the [sic] will sell over 300K next year."  (*Id.*)  Mansour described a series of additional Archos products that may use Sproqit products, and the royalties that Sproqit would receive.  (*Id.*)  Trooien also points to an undated internal Sproqit document stating that the Archos deal would provide "up to $3M in the first year, $10M in year 2, and $15M in year three."  (Baehr Aff., Docket No. 124, Ex. I at 9.)  It later became apparent that Archos was only obligated to make payments to Sproqit if it elected to include Sproqit features on its products, and that Archos had elected not to do so.  (Trooien Decl., Docket No. 125, ¶ 8.)  Trooien alleges that he was never made aware that this was the nature of the contract.  (*Id.*)

---

[1] In the Court's prior order, these statements – along with numerous others related to revenue projections and other Sproqit business arrangements – were dismissed as a basis for any securities claim.  *See Trooien v. Mansour*, No. 06-3197, 2008 WL 2202720 (D. Minn. May 23, 2008).  They are included here because Trooien now relies on them as a basis for his fiduciary duty claim.

**B.     Bell Mobility**

Trooien also alleges that he was specifically misled by revenue projections for Sproqit's relationship with Bell Mobility.  (*See* Baehr Aff., Docket No. 124, Ex. H.)  The projections sent to Trooien on December 21, 2004, included $1,929,295 in revenue arising out of this relationship in 2005.  (*Id.*)  As with the Archos arrangement, it later became apparent that Bell Mobility had no affirmative obligation to by specific quantities of Sproqit's products.  (Trooien Decl., Docket No. 125, ¶ 9.)  Trooien again alleges that he was never made aware of the nature of this contract.  (*Id.*)

**C.     Microsoft**

Trooien also points to representations that Mansour made concerning the likelihood that Sproqit would be acquired by Microsoft.  Trooien alleges that at some point Mansour told him that Microsoft had given the "green light" to acquire Sproqit, and that it was a "done deal."  (Trooien Decl., Docket No. 125, ¶ 7.)  This came after Mansour had explained his former employment with Microsoft and his understanding of Microsoft's internal operations.  (*Id.*)  Trooien's attorney, George Eck, also avers that Mansour told him "[d]uring the summer of 2005" that Sproqit "would be acquired by Microsoft."  (Eck Aff., Docket No. 123, ¶ 4.)

On November 8, 2005, Mansour sent Trooien an email in anticipation of a meeting with Microsoft.  (Trooien Decl., Docket No. 125, Ex. A.)  In that email, Mansour stated:

> The other day, you mentioned that you wanted to sit in on a meeting.  I'm torn – that's why I offered to have you there by phone.  I want you to see the interest in person so you won't have to take my word for it. . . .  But I

am also concerned.  These people speak a different language, Jerry, on that I am well accustomed to.  I am very good at maneuvering within Microsoft. If you come to this meeting or any of the other can we agree on certain ground rules?

(*Id.*)  Mansour went on to explain those "ground rules," and also described several reasons to be optimistic about the Microsoft relationship.  (*Id.*)  Mansour added, however, "[w]e are not at the negotiation phase, yet."  (*Id.*)

Later, on January 25, 2006, Mansour sent Trooien another email concerning Microsoft.  (*Id.*, Ex. B.)  Mansour stated "They are in.  The next step is for them to come up with a number.  [A Microsoft agent] says he needs a couple of days to run a make vs. buy analysis.  He says the good news is that [another Microsoft agent] really took to my last email to him and sees the revenue value of doing the deal."  (*Id.*)  Mansour went on to describe how Microsoft would do further due diligence, and suggested a possible offer that Sproqit could bring to negotiations.  (*Id.*)  Sproqit was never acquired by Microsoft.

### D.     Mansour & Roitblat's Departure

On November 30, 2005, Roitblat and Mansour exchanged emails concerning their ability to meet Sproqit's payroll obligations.  (Baehr. Aff., Docket No. 124, Ex. J.) Roitblat stated:

If we are not going to issue checks today, I think we need to lay everyone off – today.  That is not intended as a ploy, I think it is our responsibility to stop accumulating more costs.

Also, if we can do something without putting you at risk, I think we should take steps to file a claim against Jerry, as a board member, for unpaid wages for this pay period.

- 8 -

(*Id.*)  Trooien also notes that in December 2005, he asked Mansour to meet with someone visiting Sproqit on his behalf, to allow Trooien to learn more about the company.  (*Id.* at Ex. K.)  Trooien contends that Mansour unjustifiably delayed this meeting, and that this delay had the potential to harm the corporation.

Trooien later hired Dave Carroll to consult with him on Sproqit.  (*See id.*, Ex. M.)  When Roitblat learned that Carroll was coming to gather information and speak with Sproqit staff – with a particular focus on Sproqit's dealings with Microsoft – he sent Mansour an email stating:

> It sounds like they are basically being asked by Jerry to interfere in the Microsoft deal.  The only thing I can see this doing is gum up the works.  Of course, if we don't hear anything back from MS today, it may all be moot.
>
> Do we have to cooperate with them?  Worst case is Jerry doesn't pay the next payroll (which he probably won't do anyway if we don't have the beginnings of an offer on the table).  Maybe I should go on vacation next week.

(*Id.*)  Carroll alleges that when he arrived, Roitblat and Mansour refused to give him access to the details of Sproqit's software or otherwise cooperate with his efforts to understand the company.  (Carroll Decl., Docket No. 126, ¶ 9.)  In February 2006, another individual contacted Sproqit on Trooien's behalf, indicating that Trooien wanted to know more about Sproqit's direction before he sent more funding.  (Baehr Aff., Docket No. 124, Ex. N.)  Roitblat responded by sending an email to Mansour, stating:

> I don't understand how many times/ways he wants to ask the same question?  What more could they want to know that we could actually tell them?

> I'm not sure why they'd want to talk to me about it, but I assume I don't
> need/want to contact them.

(*Id.*)

After Trooien failed to provide the funding for Sproqit to meet its payroll

obligations that month, Mansour sent the following email on February 28, 2006, to

Roitblat and Sproqit's outside counsel:

> I need help from the Brain trust.  Jerry did not make payroll, and he knows
> it.  He has been on line because he answered other emails.  I know what the
> "right" thing to do is, but I'm looking for the least inflammatory way of
> doing it.

(*Id.*, Ex. O)  Roitblat responded:

> I'm prepared to tender my resignation to make it clear this is real.  That
> might be the way to get this started. . .

(*Id.*)   Roitblat resigned from Sproqit on March 1, 2006, and Mansour resigned on

March 6.  The rest of Sproqit's employees resigned near that time as well.  Trooien

subsequently directed Carroll to gather information about the status of Sproqit's assets.

Carroll indicated that Mansour and Roitblat were uncooperative.  Carroll avers that

Mansour and Roitblat left Sproqit's assets "in a difficult to locate [and] unsecure . . .

status."  (Carroll Decl. ¶ 8.)

Trooien claims that Mansour's conduct violated § 80A.01 of the Minnesota

Securities Act and constituted common law fraudulent and negligent misrepresentation

under Minnesota law.  In short, Trooien alleges that Mansour misled him in order to

induce further investment.  Following two Orders by this Court granting prior motions to

dismiss, Trooien's claims are limited to (1) Mansour's statement that it "was an absolute

fact that Sproqit would be acquired"; (2) Mansour's statement that there were "contracts in place" with Bell Mobility that would generate substantial revenues for Sproqit; and (3) Mansour's predictions of future revenue that are based on either (1) or (2).  Trooien also alleges that both defendants violated fiduciary duties owed to him under Washington law.  Both defendants now seek summary judgment on all of the claims that remain.

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   MINNESOTA SECURITIES ACT (COUNT 1)

The Minnesota Securities Act ("MSA") makes it unlawful for a person, in connection with the offer, sale, or purchase of a security, "to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make a statement made . . . not misleading."  Minn. Stat. § 80A.68(2).  The elements of a securities fraud

claim under § 80A.68 are "essentially the same" as a federal securities fraud claim under Rule 10b-5. *Erickson v. Horing*, 2001 WL 1640142, at *7 (D. Minn. 2001). "Both statutes require a misrepresentation with scienter in connection with a transaction in a security on which the plaintiff justifiably relies to his detriment." *Id.*

### A.   Microsoft Acquisition Statement

The first misrepresentation remaining is Mansour's alleged statement that it was an "absolute fact" that Sproqit would be acquired. Sproqit, of course, was never acquired. Mansour argues that the pattern of communications set forth above demonstrate that Trooien was fully apprised of the status of the Microsoft negotiations, and was given no false or misleading information. Mansour adds that there is no evidence that he told Trooien it was an "absolute fact" that Sproqit would be acquired. Moreover, Mansour argues, Trooien admits that he knew there was no actual, signed contract between Sproqit and Microsoft, and that as a sophisticated investor he would have realized that this meant nothing was guaranteed. Trooien responds that the question of whether Mansour actually made the "absolute fact" statement – as well as the question of whether the evidence as a whole would prevent such a statement from being actionable – is a fact question for a jury.

The Court agrees that this claim is insufficient to survive summary judgment. The Court first notes that the specific statement allowed to go forward was the statement that it "was an absolute fact that Sproqit would be acquired." *Trooien v. Mansour*, No. 06-3197, 2008 WL 2202720, at *9 (D. Minn. May 23, 2008). The Court explained that a

statement with this degree of clarity was necessary, because it potentially misrepresented a "then-existing material fact," rather than a mere inaccurate prediction. *Id.* at *4. This is particularly critical here, where the party alleging the fraud was an experienced investor and was likely to possess an above-average understanding of the inherent uncertainty of business negotiations. At summary judgment, however, Trooien has failed to provide any evidence that the "absolute fact" statement actually occurred. When he was questioned about Mansour's representations in his deposition, Trooien did not assert that Mansour used the words "absolute fact" in describing the prospects of a Microsoft acquisition. (*See* Buckley Aff., Ex. 113, at 184-211.) Trooien also submitted an affidavit describing Mansour's Microsoft representations at length. (*See* Trooien Decl., Docket No. 125, ¶ 7.) Again, the phrase "absolute fact" is absent. (*Id.*) Finally, Trooien's attorney has submitted an affidavit indicating that Mansour made representations to *him* about the Microsoft negotiations.[2] (Eck Aff., Docket No 123, ¶ 4.) Eck's quoting of the specific representations made by Mansour, however, does not include the phrase "absolute fact."[3] (*Id.*) In sum, this Court permitted a specific statement about the

---

[2] Defendants move to strike Eck's affidavit for Trooien's failure to identify him as a witness with discoverable information. Because the Court dismisses Trooien's claims even with this affidavit included in the summary judgment record, the Court denies defendants' motion as moot.

[3] While Eck notes that Mansour "represented [the sale] as an absolute fact," this comes after he quotes the specific words used by Mansour. The Court presumes that if the "absolute fact" language was actually used by Mansor, Eck simply would have quoted that language as well. Regardless, Eck's vague indication that Mansour's representation was made "[d]uring the summer of 2005" does not provide enough particularity to support a fraud claim. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997) (explaining that allegations of fraud must include the time, place, and contents of false representations).

Microsoft negotiations to go forward, and Trooien offers no evidence or testimony demonstrating that this statement occurred.

The Court notes that while Trooien and Eck allege several other vague assurances about the Microsoft deal, these alleged statements fall short of an actionable claim as well. The only statements that Trooien makes any effort to tie to a particular time or place in his brief and affidavit are statements from Mansour's emails on November 8, 2005, and January 25, 2006. (*See* Trooien Decl., Docket No. 125, ¶ 7.) When read as a whole, however, these emails clearly do not constitute actionable misrepresentations. As noted above, the November 8, 2005, email specifically states "[w]e are not at the negotiation phase, yet." (*Id.*, Ex. A.) In addition, the January 25, 2006, email specifically contemplates further negotiations and additional due diligence. (*Id.*, Ex. B.) In those circumstances, no reasonable juror could conclude that these emails – or any other communications by Mansour – were affirmative representations that the sale was either completed or certain to be completed. In short, the lack of finality in these negotiations was expressly conveyed to Trooien. Accordingly, to the extent that Trooien's MSA claim is based on statements about the Microsoft negotiations, that claim is dismissed.

## B.     Bell Mobility Statement

The second remaining basis for Trooien's securities claim is Mansour's statement that Sproqit had "contracts in place" with Bell Mobility. The Court allowed this claim to go forward on the basis of Trooien's allegation that "there were no contracts in place with

Bell Mobility." *Trooien*, 2008 WL 2202720, at *5.  As defendants note, however, it is now clear that Mansour's statement was true:  Mansour has submitted a copy of a contract between Sproqit and Bell Mobility entered into on November 30, 2004.  (*See* Mansour Aff., Docket No. 114, Ex. I.)

Trooien argues that this claim should nonetheless be allowed to go forward because Mansour misrepresented the profitability of this contract.  As this Court stated in its prior Order, however, "[t]hat a prediction of future revenue never comes to be does not mean that the prediction was false when made." *Trooien*, 2008 WL 2202720, at *4 (internal quotation marks omitted).  Such a conclusion would allow claims of "fraud by hindsight," which is why this Court required the presence of something as definitive as a misrepresentation about whether contracts were actually in place.  *Id*.  In any event, Trooien points to nothing in the record that sufficiently demonstrates what Mansour would or should have known about the profitability of the Bell Mobility contracts at the time of his statements, and does not point to anything else in the record tending to show that his statements amounted to misrepresentations of then-existing material facts.  Accordingly, to the extent that Trooien's MSA claim is based on statements about these contracts, that claim is dismissed.

### C.  Revenue Predictions Based on either the Microsoft Acquisition Statement or the Bell Mobility Statements

Finally, the Court also allowed Trooien's MSA claim to go forward as to revenue projections based on either of the alleged misrepresentations addressed above.  The Court explained that the misrepresentations discussed above were a necessary component of

any revenue-based claims, in order to "remove the taint of 'fraud by hindsight.'" *Trooien*, 2008 WL 2202720, at *5. Because the Court has dismissed both of these misrepresentations, the Court dismisses this basis for Trooien's MSA claim as well.

## III.   NEGLIGENT AND FRAUDULENT MISREPRESENTATION (COUNT 2)

"In Minnesota, an actionable misrepresentation requires proof either that the misrepresenter acted dishonestly or in bad faith, i.e. with fraudulent intent, or, alternatively, that the misrepresenter was negligent." *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986). "Under neither theory, however, is one held to warrant the truth of all statements made. A good faith, non-negligent mistake is not the basis of liability for misrepresentation in this state." *Id*.

In this Court's prior Order, it noted that Trooien's negligent and fraudulent misrepresentation claim is subject to the same particularity requirements as his MSA claim, and restricted that claim to the same narrow grounds. *Trooien*, 2008 WL 2202720, at *8-9. Based on this Court's analysis of those grounds given above, this Court finds that there is not a sufficient factual basis for a jury to find specific, actionable instances of fraud or negligence. As explained above, the specific Microsoft statement that this Court allowed to proceed does not appear in the record. The only other statements related to the Microsoft negotiations that were tied to a sufficiently specific context to be actionable were accompanied by explicit indications that the negotiations were on-going. In addition, the Bell Mobility statement this Court allowed to proceed is undisputedly true, and Trooien has failed to provide a factual basis sufficient to show that any other

statements about those contracts were misrepresentations. Thus, Trooien's claim for negligent or fraudulent misrepresentations is dismissed.

## IV.     BREACH OF FIDUCIARY DUTY (COUNT 3)

Under Washington law, directors of a corporation are required to discharge their duties "(a) [i]n good faith; (b) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances [i.e., the duty of care]; and (c) in a manner the director reasonably believes to be in the best interests of the corporation [i.e., the duty of loyalty]." Wash. Rev. Code § 23B.08.300, .420. Washington's Business Corporation Act adds that:

> [A]rticles of incorporation may contain provisions . . . that eliminate or limit the personal liability of a director to the corporation or its shareholders for monetary damages for conduct as a director, provided that such provisions shall not eliminate or limit the liability of a director for acts or omissions that involve intentional misconduct by a director or a knowing violation of law by a director[.]

Wash. Rev. Code § 23B.08.320. This statute permits a corporation to limit liability for violations of the duty of care, but not for the duty of loyalty or the duty to act in good faith. *See Grassmueck v. Barnett*, 281 F. Supp. 2d 1227, 1232-33 (W.D. Wash. 2003). Sproqit's Articles of Incorporation limit the liability of its directors to the fullest extent available under Washington law. (*See* Mansour Aff., Docket No. 114, Ex. O at 14.) Accordingly, in order to bring a claim that Mansour or Roitblat violated their fiduciary duties, Trooien must provide sufficient evidence that they engaged in intentional

misconduct or knowingly violated the law, violated the duty of loyalty, or violated the duty to act in good faith.[4]  *See Grassmueck*, 281 F. Supp. 2d at 1233.

### A.      Revenue Projections

Trooien first argues that Mansour violated his fiduciary duties by providing him with revenue projections that "clearly had no basis in objective facts."  (Mem. in Opp'n to Peter Mansour's Mot. for Summ. J., Docket No. 122 at 27.)  Trooien also brings a claim against Roitblat for failing to correct these projections and for failing to warn Trooien that they were unreasonable.

As set forth above and in this Court's prior Order, the Court has rejected this as a basis for either an MSA claim or a claim for fraudulent or negligent misrepresentation. The primary grounds for this dismissal are Trooien's failure to provide legally sufficient evidence that Mansour knew the revenue projections were based on false or inadequate information.  In short, Trooien has failed to adequately distinguish this case from one where disputed projections were merely overly-optimistic.  In those circumstances, the Court finds no basis for allowing Trooien to proceed with his failed securities allegations under a fiduciary duty theory.  In the absence of a single actionable misrepresentation –

---

[4] Trooien briefly argues that Wash. Rev. Code § 23B.08.320 merely allowed Sproqit to limit the liability of its directors, and that it does not limit the liability of corporate officers. Regardless of whether a different standard would apply to actions taken as corporate officers, Trooien alleged in his First Amended Complaint that – in addition to their roles as corporate officers – Mansour was a Sproqit director "at all relevant times," and that Roitblat was a director "for a significant period of time."  (Am. Compl., Docket No. 42, ¶¶ 3, 4.)  Trooien makes no effort to disentangle their activities as directors from their activities as officers – or explain the specific timeline when Roitblat served as a director – leaving this Court without a basis for limiting the applicability of the Sproqit articles of incorporation (and its limitation of defendants' liability) to specific acts or time periods.

and with little beyond general assertions that Mansour's revenue projections were unreasonable – the Court finds nothing in the record sufficient to demonstrate intentional misconduct, a knowing violation of the law, or a violation of the duties of loyalty and good faith.

Trooien argues that this claim should nonetheless go forward on the basis of the "catch 22" email quoted above, which Trooien argues demonstrates bad faith. The Court, however, finds nothing in that email sufficient to persuade a reasonable juror that Mansour was dishonest with Trooien, or otherwise engaged in misconduct. The email in question reveals some uncertainty about whether certain deals would be finalized and discussions about how to account for those deals. However, when Heimbigner ultimately sent the projections to Trooien, he expressly stated:

> Note that this is a preliminary draft that is prior to the completion of negotiations with these customers. Pete [Mansour] is currently in discussions with these prospective customers. Thus there is a risk that some of these deals may not occur.

(Baehr Aff., Docket No. 124, Ex. H.)   In other words, Mansour and Heimbigner expressly conveyed the uncertainty of these deals to Trooien. Those circumstances do not rise to an actionable claim for breach of defendants' fiduciary duties.[5]

---

[5] The Court also notes that Trooien was unable to point to any specific projections that he relied on in making investments. (*See, e.g.*, Buckley Aff., Docket No. 113, Ex. A at 153-54.) This failure may also have prevented Trooien from demonstrating that any breach by Mansour was the proximate cause of his damages. *See Senn v. Nw. Underwriters, Inc.*, 875 P.2d 637, 639 (Wash. App. 1994) (noting that in order to establish a claim for a breach of fiduciary duty under Washington law, a plaintiff must establish "that the breach was a proximate cause of the losses sustained").

**B.      Bell Mobility & Archos Contracts**

Trooien next argues that Mansour specifically overstated the value of the Bell Mobility and Archos contracts, and that Roitblat failed to warn him about these misstatements.  As noted above, these contracts did not require Bell Mobility or Archos to purchase specific quantities of Sproqit's products.  The mere fact that these contracts were not as profitable as expected, however, is not sufficient to demonstrate Mansour's optimism amounted to a violation of his fiduciary duties, or even that it was unfounded. Moreover, as Mansour notes, Trooien was a Sproqit director who had an affirmative duty to be aware of his company's affairs.  *See Senn v. Nw. Underwriters, Inc.*, 875 P.2d 637, 640 (Wash. App. 1994).  While Trooien was ultimately incorrect in his projections for the Archos and Bell Mobility contracts, there is no allegation in this case that he rebuffed any attempts by Trooien to see the relevant contracts, or affirmatively stated that proceeds from this contract were guaranteed.  In those circumstances, the Court fails to find sufficient evidence to persuade a reasonable juror that Mansour's statements about these contracts amounted to a breach of defendants' fiduciary duties.

**C.      Microsoft**

Trooien next argues that Mansour violated his fiduciary duties by overstating the likelihood of an acquisition by Microsoft.  As noted above, the Court finds nothing in these statements that rises to actionable misrepresentations of then-existing material facts. As with Trooien's revenue-projection claims, the Court fails to see a basis for allowing Trooien to resurrect this claim as a violation of Mansour's fiduciary duties.  As is evident

from the summary of the record given above, while Mansour's representations were optimistic, the parties' written correspondence demonstrates that he consistently revealed the acquisition negotiations were a work in progress. Trooien has not brought forward sufficient evidence that any of these emails – or any of Mansour's vaguely recounted oral statements – amounted to intentional misconduct or knowing violations of law, or otherwise violated Mansour's fiduciary duties.

### D.    Bad Faith in the Months Before Defendants' Departure

Finally, Trooien alleges that Mansour and Roitblat demonstrated bad faith over the course of their last four months at Sproqit. Specifically, Trooien alleges that Mansour and Roitblat (1) conspired to set up Trooien for a lawsuit; (2) failed to meet with a consultant sent by Trooien; and (3) generally failed to help with Sproqit's transition in a way that safeguarded Sproqit's assets.

As to the alleged discussions about a lawsuit, emails in the record suggest that Mansour and Roitblat were indeed contemplating legal action when Trooien failed to make the payroll. Nothing in the record, however, suggests that these idle discussions led defendants to actually file an action, or that there was anything wrongful about them contemplating their rights. Similarly, Trooien offers only brief, conclusory assertions about the importance of the meeting between Mansour and a consultant, and no evidence that it resulted in any harm. Accordingly, these grounds for Trooien's fiduciary duty claim are dismissed.

The claim about Mansour and Roitblat's management of Sproqit's assets before their departure, however, presents a closer call.  Carroll indicates that when he arrived at Sproqit, "[s]uch an overwhelming amount of common operational and product data was missing that it would prohibit or at least greatly undermine us or others an opportunity to consider the rescue of Mr. Trooien's investment by continuation of business or the sale of said business."[6]   (Carroll Decl., Docket No. 126 at ¶ 13.)   While Mansour points to emails to Trooien offering to coordinate a transition three months earlier, this certainly does not demonstrate that he and Roitblat proceeded appropriately before their departure as a matter of law.

The Court agrees with defendants, however, that Trooien does not have standing to pursue this claim.  In order to bring a direct action against corporate directors – as opposed to a derivative action – a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."  *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004); *see also* 19 AM. JUR. 2d *Corporations* § 1935 (reciting the same principle).[7] Here, the injuries alleged by Trooien that are detailed in Carroll's affidavit are clearly injuries to Sproqit's corporate assets.  These actions, if harmful, only impacted Trooien to

---

[6] Defendants move to strike Carroll's affidavit for Trooien's failure to identify him as a witness with discoverable information.  Because the Court dismisses Trooien's claims even with this affidavit included in the summary judgment record, the Court denies defendants' motion as moot.

[7] While defendants concede there is no Washington state court decision directly addressing this principle, Delaware's courts are treated as the touchstone for corporate governance principles throughout the country.  *See, e.g., In re Patterson Cos., Inc. Sec.*, 479 F. Supp. 2d 1014, 1038 (D. Minn. 2007).

the extent that he had a financial interest in the health of the corporation.  In those circumstances, Trooien's claim regarding Mansour and Roitblat's handling of corporate assets prior to their departure must be brought as a derivative action, and is dismissed without prejudice.

**ORDER**

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Peter Mansour's Motion for Summary Judgment [Docket No. 111] is **GRANTED**.  Trooien's claim that Mansour violated his fiduciary duties by failing to assist with Sproqit's transition is **DISMISSED without prejudice**.  Trooien's remaining claims against Mansour are **DISMISSED with prejudice**.

2.      Defendant Barry Roitblat's Motion for Summary Judgment [Docket No. 116] is **GRANTED**.  Trooien's claim that Roitblat violated his fiduciary duties by failing to assist with Sproqit's transition is **DISMISSED without prejudice**.  Trooien's remaining claims against Roitblat are **DISMISSED with prejudice**.

3.      Mansour's Motion to Strike [Docket No. 134] is **DENIED as moot**.

4.      Roitblat's Motion to Strike [Docket No. 141] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 31, 2009
at Minneapolis, Minnesota.

_s/ John R. Tunheim_
JOHN R. TUNHEIM
United States District Judge